

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00062-CR

———————————————

THE STATE OF TEXAS, Appellant

V.

BRANDON JOHNSON, Appellee

---

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. F21-1059-158

---

Before Bassel, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

In one issue, the State of Texas appeals the order of the trial court dismissing the murder indictment of Appellee Brandon Johnson before trial and without the State's consent. *See* Tex. Code Crim. Proc. Ann. art. 44.01(a)(1) (allowing the State to appeal a trial court order that dismisses an indictment). Based on allegations of discovery violations by the State, Johnson had moved for dismissal of the indictment or, alternatively, other remedies. At the conclusion of the hearing on the motion to dismiss, the trial court described the State's discovery conduct as "reckless" but without "purposeful, evil intent" and entered a dismissal order that included a finding of "reckless actions by the State." However, the record is unclear regarding the extent of any alleged discovery violations.

Therefore, we will assume without deciding that Johnson's constitutional right to due process was violated by the State's discovery conduct. However, we will reverse and remand the trial court's order because the record does not reflect that the trial court considered alternative remedies short of the drastic step of dismissal that could have possibly cured any harm to Johnson.

## II. BACKGROUND

## A. Johnson is arrested and later indicted for murder.

In March 2021, Johnson was arrested for the murder of Michael Darrough.

The arrest-warrant affidavit provided, in part,[1]

> At approximately 2:22 AM on February 6, 2021, Lake Dallas Police Officers responded to a reported shooting in the apartment complex at 300 E. Swisher Rd., Lake Dallas, Denton County, Texas near the office. Upon arrival, officers discovered victim **Michael Darrough B/M [birth date omitted]** injured on the sidewalk near the office with multiple gunshot wounds. Also present at the scene was a witness . . . who had driven the victim to the location. It was learned from the witness that the victim lived in the complex with a girlfriend . . . later identified as **Elicia Mann**. The witness advised that the victim suspected Mann of cheating on him, and the victim had requested [the witness] to drive him to the complex so he could retrieve some of his belongings.
>
> . . . .
>
> As the victim entered the gate [at the apartment complex], the witness heard numerous gun shots and saw flashes from a gun. As [the witness] watched, she observed three persons other than the victim inside the gate. [The witness] described the subjects as one female and two males. [The witness] stated that when she saw and heard the gunshots, she observed the female and males run to the "suspicious" car they had observed and speed off. The witness called 911, and the Lake Cities Fire Department transported the victim to Medical City Denton, where he died.
>
> While responding officers and crime scene technicians were working the scene, complex staff provided video from several cameras located in front of the office. . . .

---

[1]Because the dismissal forming the basis of this appeal occurred prior to trial, we look to the facts in the affidavit to provide the background for Johnson's arrest and to put into context the trial court's dismissal of Johnson's murder indictment.

The left rear passenger[] (later identified as **Brandon Kingsley Johnson**) can be seen [on the video] concealing a handgun in his waistband. He walked several feet away, jumped the fence, and then opened the gate from the inside, allowing the other two to enter. A short time later, the victim and witnesses' vehicle pulled into a parking space several spaces from where the Ford had parked. The victim got out and walked to the gate. Multiple flashes from gunfire were observed on the video, and one tall male and one female subject were observed running from the gate to the Ford Focus. Johnson, who was the shorter subject, can be seen pausing twice to fire multiple times at the victim and then running back to the Ford Focus. . . .

Family members of the victim began to arrive at the scene, and Lt. Stone began interviewing them . . . . During the interview with Elicia, Lt. Stone learned that on the previous evening (February 5th, 2021) she had travelled to the residence of her cousin in North Dallas, suspect **Shineisha Mann**, to spend the night. Elicia's 11-year-old daughter went with her.

Upon arrival at Shineisha's apartment [address omitted], Elicia and her daughter saw Shineisha, Shineisha's brother, Lindsey, and a third person whom Shineisha introduced as "her new boyfriend[."] (This person was later identified through investigation as suspect **Brandon Kingsley Johnson**). . . .

The juvenile stated that after her mother went to bed, she heard Shineisha engage in an argument with the victim on the phone. A short time later, Shineisha came into her bedroom, stating that she had to "go do something[."] The juvenile noticed that Shineisha, Lindsey, and Shineisha's boyfriend had changed into all black clothing. After a period of time, the juvenile received a phone call from Shineisha asking for the pedestrian gate code at the complex where she lived with her mother. . . .

Investigation revealed that Shine[i]sha Mann drives a silver Ford Focus, which appears identical to the suspect vehicle in the apartment complex video. . . .

On 02/06/21, **Shineisha Mann** and her brother, **Lindsey Ladell Crumpton II**[,] were arrested for Murder. . . .

4

On 2/9/21, the search warrant for the [Ford Focus] was executed. DCSO Forensic Investigator Ashleigh Berg identified a latent print developed on the exterior of the vehicle as belonging to **Brandon Johnson**, 12/11/1981. Berg stated that she believed the latent print was a "fresh print" and taken from the area of the left rear door. This is the same door that Johnson was seen exiting from and entering into in the surveillance video of the shooting.

Also included in the arrest warrant were Elicia's[2] and the juvenile's descriptions of Johnson as a "short, thin[-]built black male, dark skinned, maybe missing front teeth or messed up front teeth, [and with] dread locks between his neck to his shoulder with facial hair." Other neighbors in the complex described Johnson similarly. The affiant for the arrest warrant stated that she had "reviewed numerous photographs of Brandon Johnson from both criminal justice and social media sources," and in the photos, "Johnson ha[d] partial dreads, a beard and gapping front teeth" and was "short with a small to medium build with tattoos, which matches the general description of 'Shineisha's boyfriend' as provided by Elicia Mann and her daughter."

On May 5, 2021, Johnson was indicted for Darrough's murder. The indictment included an enhancement paragraph for the May 2004 felony offense of aggravated robbery.

---

[2]Because Elicia Mann and Shineisha Mann share the same surname, we will refer to them by their first names except where quoting from the record.

**B. Johnson makes discovery requests, and the case is set for trial.**

On May 11, 2021, Johnson made his first discovery request. It was made by email from his attorney and requested "offense reports," "documents and papers," "written or recorded statements," and "any other discovery mandated under . . . Article [39.14 of the Texas Code of Criminal Procedure]."

In January 2023, Johnson's attorney filed several motions, including a "Request for Discovery Pursuant to The Michael Morton Act[3]—Tex. Code Crim. Proc. Art. 39.14 & Brady v. Maryland, 373 U.S. 83 (1963)" and a "Motion for Production of Witness Statements."

The case was first set for jury trial to begin in January 2023. It was later reset for April 10, 2023. Shortly before that setting, the State moved for a continuance based on the unavailability of a witness. While there is no order in the record resetting the case for trial, it appears that the continuance was granted.

**C. Johnson files two motions to dismiss the indictment.**

On August 30, 2023, Johnson's attorney filed "Defendant's Motion to Dismiss Due to Destruction of Evidence, Failure to Timely Disclose, and Due Process Violations." In the motion, Johnson alleged the following:

> The Lake Dallas Department destroyed multiple supplements written by Lake Dallas Police Officers, forensic telephone analysis data and reports, and photographs. . . . Said evidence is material, exculpatory evidence, so

---

[3]Michael Morton Act, Act of May 16, 2013, 83rd Leg., R.S. ch. 49, Tex. Gen. Laws 106, 106 (codified at Tex. Code Crim. Proc. Ann. art. 39.14).

6

bad faith is not an element needed to show a violation of federal due process. . . .

Should the Court reject the claim that multiple Lake Dallas Police Department officer written supplements, forensic telephone analysis data and reports and photographs are not "material, exculpa[t]ory evidence," there can be and in this case, there is still a due process violation. . . .

The State of Texas, by and through its agents at the Lake Dallas Police Department, destroyed evidence that was at least "potentially useful evidence" for the Defendant, and they did so in bad faith. . . .

Johnson's prayer requested dismissal of the charge against him or submission of a limiting instruction on spoliation[4] as well as suppression of "the evidence related to the autopsy or at least the cause of death testimony by [the] Medical Examiner." This request for dismissal was not ruled on at that time.

In October 2023, the case was set for trial to begin on February 5, 2024, with docket call on January 24, 2024.

On December 21, 2023, Johnson's attorney filed "Defendant's Motion to Dismiss Due to Failure to Timely Disclose, and Due Process Violations." In the motion, Johnson alleged the following:

The Lake Dallas Police Department destroyed and with[h]eld multiple supplemental written reports by Lake Dallas Police Officers[;] additionally[,] they concealed forensic telephone analysis data, reports, and photographs, photographic analysis[,] and suspect background investigations[, i]ncluding the identification of another suspect, with the same name, that is not the defendant in this case.

---

[4]"Spoliation concerns the loss or destruction of evidence." *Guzman v. State*, 539 S.W.3d 394, 401 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

7

The motion noted Johnson's prior requests for discovery, adding that the Lake Dallas Police Department had failed to respond to the District Attorney's request for materials "until August 24, 2023 when ADA Dobson physically searched the files at the Lake Dallas Police Department herself, discovering approximately an additional t[e]rabyte of undisclosed evidence, merely 4 days before pre-trial hearings and just over 2 weeks before the beginning of trial, set for September 11, 2023."  Johnson's prayer again sought dismissal of all charges against him or suppression of the "hidden, secret evidence that was maintained in the exclusive custody of the Lake Dallas Police Department for over two and one-half years that is material to the guilt [of] Brandon Johnson."

## D.  The trial court has a hearing on Johnson's motion to dismiss.

In January 2024, the trial court conducted a hearing on Johnson's motion to dismiss; it is not clear from the record which of the two motions to dismiss was heard.[5]  Johnson's attorney referred generally to "defense's motion for a dismissal" and argued for dismissal "due to failure to timely disclose and/or for destruction of evidence related to due process violations."  Two witnesses were called at the hearing: (1) Brenda Hall, a lieutenant over support services for the Lake Dallas Police

---

[5]The order dismissing the indictment was entitled "Order on Defendant's Motion to Dismiss Due to Due Process Violation" and stated only that "Defendant's Motion to Dismiss" was granted.  In both the State's and Johnson's briefs, the parties refer to the second motion as the one that was heard.

Department; and (2) Mark Stone, who prior to retirement, was the supervisor of the criminal investigation division of the Lake Dallas Police Department. Numerous exhibits were also admitted into evidence.

### 1. Lieutenant Brenda Hall testifies.

The first witness—Lieutenant Brenda Hall—testified that on the day of the hearing, she was third in charge of the Lake Dallas Police Department and in charge of all the other detectives. However, during the investigation of Darrough's murder, Lieutenant Stone was the lead investigator. According to Hall, Stone had a District Attorney's Office portal on his computer, and he would upload materials to the portal. When Stone retired, the case had been "filed," which to Hall meant that Stone had "filed [the case] with the e-portal, the DA's e-portal . . . filing system." After Stone retired, she would just add anything pertinent to the case, such as "lab results or something along those lines," to the e-portal.

Hall maintained a spreadsheet with information, including jail communications "for all three codefendants, for Shineisha Mann, Lindsey Crumpton, and Brandon Johnson." She used the spreadsheet "to document [her] interactions" and "to chronologically keep up with things."

With regard to jail phone calls, Hall testified, "Some of them [she] listened to, and some of them [she] was very busy. And some of them were put on [her] desktop or put on a file." According to Hall, while in the beginning jail calls might contain information about the case, the longer a person is in jail, the more the calls become

9

"everyday stuff." So when she received recorded jail calls from the Denton County Sheriff's Department, she did not listen to the majority of them. Rather, she downloaded them to her computer desktop, and they did not make it to either the hard drive or the network drive.

Hall included two jail calls relating to Shineisha on her spreadsheet. However, when asked whether she had received Shineisha's "HomeWAV[6] phone calls," Hall responded, "I received some, I think. I'm not positive. Honestly, I don't know. I think I did get some phone calls, but I don't know if they were HomeWAV or they were just recorded calls." When later asked if she had any idea where Shineisha's calls might be saved, Hall responded, "I can't."

With regard to jail phone calls for Lindsey Crumpton, Hall testified that she thought that the police department received some phone calls on Crumpton, but she did not know if they were HomeWAV or just regular jail calls. According to Hall, she thought that the calls were "probably put on the external hard drive or on our work hard drive."

Hall thought that she requested phone calls for Johnson, but she did not know if she listened to all of them because she "was just inundated with tasks." The calls "were uploaded in either [Hall's] working file that [she] had on [her] desktop or the

---

[6]"HomeWAV" is a company that has "a singular focus on video call offerings for people who are incarcerated." Isabelle M. Geczy, *Captive Without Counsel: The Erosion of Attorney-Client Privilege for Incarcerated Individuals*, 70 UCLA L. Rev. 1084, 1104 (2023) (footnote omitted).

CID hard drive." The CID drive was a "shared drive by all the detectives" or something like a network drive to which everybody had access.

Hall worked on the case with Tracy Cushman, a crime analyst with the Denton County Sheriff's Department. If Cushman flagged something as interesting, Hall would "try to take the downloads that [she] could and just throw them into either the - - [her] working file or onto the CID working file." When asked what she did to preserve the evidence, Hall stated that she "did download it to the external hard drive . . . so [she] would make sure [the police department] wouldn't lose it."

According to Hall, in the last week of August 2023, a District Attorney's Office investigator went to the Lake Dallas Police Department and helped them download the police department's external hard drive onto another two-terabyte external hard drive to make sure everything was copied. According to Hall, it had to be put on the external hard drive because "there was too much data." Hall also recalled that the police department got Stone's external hard drive to make sure everything was copied.

Hall recalled speaking to neighbors at Shineisha's apartment complex and showing them Johnson's photo. She believed that the District Attorney's Office had asked for a copy of the photo, and she told them that it was Johnson's driver's license photo.

Hall also remembered a March 2021 conversation with Stan Goodwin, who was Shineisha's attorney, about Shineisha's calling Goodwin to identify a third person as the shooter—a different person named Branden Johnson. The transcript of the

11

telephone call, which was admitted into evidence, provided in part (not corrected for grammar, spelling, or punctuation):

Stan Goodwin (00:11):
Okay. I spoke to the defendant And Uh, I don't think we're going to do an interview, but she does want to give you the name of the shooter unless you've already got got him.

Detective Hall (00:24):
Great. What's the name?

Stan Goodwin (00:26):
His name is Brandon Terrell Johnson. He's been in Denton County Jail numerous times. So you can check his photograph through there[.]

. . . .

Detective Hall (01:34):
Does she specifically tell you the middle name of Tyrell?

Stan Goodwin (01:40):
Uh, no, but that's, let me, lemme see. It's Terelle. Let me see how you spell it.

Detective Hall (01:49):
But did she, but did she say Terell, Brandon Terrell?

Stan Goodwin (01:54):
No, she said Brandon Johnson.

. . . .

Detective Hall (02:26):
Well, what I'm talking did she tell you anything else about Brandon? Like anything identifying about him?

Stan Goodwin (02:34):
Uh, she just said that, well, I don't know. I think, I think he's on her Facebook page is what I was told by another attorney. But, um, I looked

12

it up and because he had a case in Collin County, I showed her that case and she said that's who it was.  I mean,

Detective Hall ((02:57):
You showed her a Facebook page?

Stan Goodwin (03:00):
No, I showed her a, a listing of a case in Collin County because she told me he had cases over there as well as Denton County.

. . . .

Detective Hall (03:30):
I don't know if Collin County can look up their jail stuff if they're not in there.

Stan Goodwin (03:36):
You can't, but look up their court cases and, oh, shoot.  Brandon Johnson.  Brandon, I think he had an agg robbery case.  Well, well, I came, I'm, I'm not sure.  It thought it was Brandon Terrelle, but now I'm, I'm not sure.

. . . .

Detective Hall (04:47):
Well just, I'm just trying to see, uh, let's see.  She tells you anything, did she even, she didn't give you a middle name?  She just said Brandon Johnson.

Stan Goodwin (04:56):
That's all she gave me.  Yeah, I I assumed it was Brandon Terrell because she said he had a long record of violent cases.  I, I mean, I'm sure I showed her a picture of him from, uh, the,

. . . .

Detective Hall (07:12):
Um, but she didn't give you that middle name, she just said Brandon Johnson?

Stan Goodwin (07:16):

13

That's correct.

According to Hall, Goodwin gave her a "wrong name," a name with a different middle name from Appellee's and with a slightly different first-name spelling.

Goodwin told Hall that he had showed Shineisha a picture of "Branden Johnson" from the Denton County website; however, Appellee did not have a mugshot on record with the Denton County Sheriff's Office at the time of the conversation between Goodwin and Shineisha. Although Hall looked up "Branden Terelle Johnson" in the Denton County jail records after the call, she was not concerned about "this Branden Terelle Johnson name" that she was given "because he [Appellee] was already identified." That was partly because, prior to Goodwin's telephone call—on February 11—Berg, the Denton County Sheriff's Office Forensic Investigator, had processed Shineisha's car and gotten a hit on a fingerprint or multiple fingerprints on the car, and those prints returned to Appellee. Berg got this "hit" because Appellee had been convicted of aggravated robbery in Collin County. Hall acknowledged that she should have turned over the call record earlier, even though police had already done an investigation surrounding Appellee by the time she talked to Goodwin and had identified other connections between Appellee and Shineisha.

After Stone retired, Hall did not know what items had been uploaded to the network drive, and it was hard to know if items had already been provided by Stone. Because of this, several members of the District Attorney's Office went to Lake

14

Dallas in August 2023 to make sure they had everything. Based on Johnson's subpoenaing of emails, it turned out that they did not have everything.

## 2. Lieutenant Mark Stone testifies.

Johnson's second witness—Lieutenant Mark Stone—testified that, on February 6, 2021, he was the lead investigator called to the scene of the murder. Later that same day, he arrested Shineisha and Crumpton. A crime scene investigation was conducted, and Shineisha's car was processed and Johnson's print was lifted off of the car. According to Stone, there were other parts of the investigation that corroborated the identity of Johnson, including interviews with neighbors and an eyewitness from that night who described a boyfriend–girlfriend relationship between Shineisha and Johnson.

Stone testified that while Hall mentioned the conversation with attorney Goodwin and the confusion regarding the middle name, he did not note it anywhere because law enforcement had already gotten a fingerprint back and identified Johnson, and there was no evidence linking a different "Brandon Johnson" to the crime. Stone testified, "Detective Hall told me at the time that there had been some confusion over the middle name, because the attorney that provided that to her had just looked on the computer himself. And he just - - he was trying to be helpful but he just pulled up the wrong one." In addition, the police had only received information through Shineisha's attorney, as Shineisha was never cooperative with giving them information face-to-face.

On cross-examination, Stone described the conversation with Hall about her phone conversation with Goodwin:

She mentioned to me that Stan Goodwin had called. And to the best of my recollection, she said Stan Goodwin had told her basically, hey, this is off the record confidentially, but I've got some information I want to give you. And something to the effect of, you can't really use this but I'm trying to help you out.

And he provided the name Brandon Johnson with a different middle name. And that Detective Hall had - - she said she had questioned him on that. And he basically told her that Shineisha had given up the name and he took it upon himself to go online and try to find the date of birth and all that. So he could give her all of the information at once.

But it appeared, in Detective Hall's opinion, that he had probably accident[al]ly pulled up the wrong Brandon Johnson.

In addition, Stone stated that "there was some conversation [with Hall] about [how] they looked at the height of this alternative suspect and he was somewhat taller than what we were seeing on the video for who we believed to be Brandon Johnson." However, he would have been concerned if there was a "viable alternative suspect" that was not looked into.

Stone also explained the process of filing a case:

So the way it worked was we had a shared server within the police department, and that server had a folder called, to be filed. And each detective had a folder on that server. And the purpose of the detective folders was for us to move information to each other, back and forth.

Like if I had something I wanted to give to Detective Hall, I would put it in her folder. She could pull it out of there and do whatever work she needed to do on her end. And once information had been - - or a case had been developed, then they would put it back - -

16

put it back up in the to-be-filed folder. And I would go in the to-be-filed folder and send it to the DA's office electronically, if possible.

I've got [to] put a caveat there, because we had a lot of computer problems with upload speeds. Data just didn't always transfer real well, especially on larger files. So some things we had to hand carry to the DA's office.

He admitted that "on a case this complicated, to be completely honest, yeah, we lost track of some stuff. Nothing intentional but there was just an overwhelming amount of data on this case." Other things, like lab reports, "trickled out" for a long period of time.

### 3. Exhibits are admitted.

Numerous exhibits were admitted into evidence at the hearing, including the following:

- a DVD containing a recording of the Hall–Goodwin telephone call;

- a transcript of the telephone call;

- jail-records search results for Branden Terelle Johnson;

- jail-records search results for Brandon Kingsley Johnson;

- a mug shot of Branden Terelle Johnson;

- March 11–12, 2021 emails between Hall and Stone about the third shooter;

- an April 20, 2021 email from Cushman, the Denton County Sheriff's Office crime analyst;

- an Outlook email list;

17

- Hall's timeline spreadsheet;

- April 19, 2021 and April 26, 2021 emails between Cushman and Hall;

- a business-records affidavit from the City Secretary and custodian of records for the City of Lake Dallas and flash drives "containing records pertaining to information related to all emails, documents, memorandums, correspondence, text messages, instant messages, and/or electronic messages sent or received by any Lake Dallas Police Department supervisor, investigator, and/or detective, in which the investigation of Michael Ray Darrough's [m]urder was mentioned, referenced, or discussed" and including "all communications where Brandon Johnson, Shine[i]sha Mann, and/or Lindsey Crumpton were referred to by name, nickname, and/or variations of his/her first, middle[,] and/or last name";

- an August 22, 2023 email between Hall and the District Attorney's Office regarding inmate calls;

- a November 29, 2021 email from Cushman to Hall that contained letters sent to Johnson while he was in custody;

- a Texas Commission on Law Enforcement "Personal Status Report" on Hall;

- a discovery timeline or what the parties described as a "kind of summary of discovery and requests";

- screenshot printouts; and

- a February 8, 2021 email from the Lake Dallas City Manager.

## E. The trial court makes its ruling on the record and signs an order dismissing the indictment.

As soon as both parties rested and closed, the trial court inquired about what discovery was still outstanding. Johnson's attorney stated, "[R]ight before we sat

down, the State provided me with a stack of stuff," but she acknowledged that she had not had a chance to go over it. After more discussion with the attorneys, the trial court stated,

> First, I'll rule that the missing materials or the late - - some late provided materials, evidence, is material, as is contemplated under Article 39.14. The Court, on its own motion, reset this matter for five months so that there would be more than ample time to address the evidentiary issues.
>
> But there's no real buffer in there with regard to, although it has not been raised, the speedy trial motion. It's potentially been raised. Some of the arguments made. And I've got a defendant sitting in jail for, according to court records as of today, I believe 1,038 days. 1,038 days.
>
> Speedy trial was raised March 29th of last year. Again, not ruling on that. But taking into consideration the speedy trial was raised, speedy trial was discussed August - - in August; that the Court itself had to continue. And everything I've heard, although the evidence I've heard wholly sustains reckless handling and reckless understanding of what's required.
>
> . . . .
>
> And so I will find reckless; which is above beyond negligent. I don't think there was purposeful, evil intent here, but wholesale reckless kind of covers it.

The trial court granted the motion to dismiss and requested an order, stating again to "[m]ake sure you include the word reckless."

Later, the trial court signed the "Order on Defendant's Motion to Dismiss Due to Due Process Violation," which stated that the court granted the motion and

19

"ma[de] a finding of reckless actions by the State." The trial court did not file any findings or conclusions.[7] The State appeals from the dismissal order.

### III. DISCUSSION

In its sole appellate issue, the State contends that the trial court erred by dismissing the murder indictment, arguing that trial courts are not authorized to dismiss indictments absent very limited circumstances, none of which apply to this case, and "because there was no violation of *Youngblood*,[8] *Brady*,[9] or Texas Code of Criminal Procedure 39.14." Johnson responds that the dismissal "was granted after other remedial measures utilized by the trial court failed to cure the State's failures to satisfy their discovery obligations, thus violating [his] state and federal constitutional rights to due process."

### A. We set out the standard of review and the law applicable to the dismissal of an indictment.

When reviewing the dismissal of an indictment, an appellate court must review the trial court's ruling under a bifurcated standard. *State v. Krizan-Wilson*, 354 S.W.3d

---

[7]The State did not request findings of fact and conclusions of law. Due to the absence of findings and conclusions, the State relies upon the trial court's express findings on the record. *See State v. Ross*, 32 S.W.3d 853, 858 (Tex. Crim. App. 2000) (stating that to avoid the effects of appellate presumptions, the non-prevailing party at a motion to suppress hearing "should attempt to get the rationale for the trial court's ruling on the record through either a verbal explanation at the hearing or express findings of fact and conclusions of law").

[8]*Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988).

[9]*Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

808, 815 (Tex. Crim. App. 2011). We must give almost total deference to a trial court's findings of facts that are supported by the record, as well as mixed questions of law and fact that rely upon the credibility of a witness. *Id.* However, we apply a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id.*

Dismissal of an indictment is "a drastic measure only to be used in the most extraordinary circumstances." *State v. Mungia*, 119 S.W.3d 814, 817 (Tex. Crim. App. 2003) (quoting *State v. Frye*, 897 S.W.2d 324, 330 (Tex. Crim. App. 1995)). "It is well established that there is no general authority that permits a trial court to dismiss a case without the prosecutor's consent." *Id.* at 816 (first citing *State v. Terrazas*, 962 S.W.2d 38, 40 (Tex. Crim. App. 1998); then citing *Frye*, 897 S.W.2d at 331; then citing *State v. Johnson*, 821 S.W.2d 609, 613 (Tex. Crim. App. 1991); and then citing *State v. Anderson*, 26 S.W.2d 174 (Tex. Comm'n App. 1930)).

"[A]s to *dismissing* prosecutions, our statutes have consistently provided only two situations in which dismissals are specifically authorized: [under] Article 32.01, where [the] defendant is detained in custody or held to bail[,] the *prosecution* may be dismissed if [the] indictment or information is not presented at the next term of court thereafter; [and under] Article 32.02, where [the] prosecuting attorney may, by permission of the trial court, dismiss a *criminal action* upon filing among the papers in the case a written statement giving reasons for such dismissal." *State v. Eaves*,

21

800 S.W.2d 220, 223 (Tex. Crim. App. 1990); *see* Tex. Code Crim. Proc. Ann. arts. 32.01, .02.

In other instances, dismissal may be the only means of adequately protecting an individual's rights against infringement by the State. *Mungia*, 119 S.W.3d at 816. As the Texas Court of Criminal Appeals has explained:

> [W]e have recognized that a trial court has the power to dismiss a case without the State's consent "when a defendant has been denied a right to a speedy trial, when there is a defect in the charging instrument, or pursuant to Article 32.01, when a defendant is detained and no charging instrument is properly presented." *Johnson*, 821 S.W.2d at 612 n.2. Additionally, a charging instrument may be dismissed to remedy a violation of the Sixth Amendment right to counsel. *Frye*, 897 S.W.2d at 331. In the context of a Sixth Amendment violation, a trial court may properly dismiss a charging instrument if "a defendant suffers demonstrable prejudice, or a substantial threat thereof, and where the trial court is unable to identify and neutralize the taint by other means." *Frye*, 897 S.W.2d at 330 (citing *United States v. Morrison*, 449 U.S. 361, 365, 101 S. Ct. 665[ ] (1981); *Terrazas*, 962 S.W.2d at 41).

*Id.*

However, a trial court's power to dismiss a charging instrument is not limited to these instances. "Rather, . . . although a particular constitutional violation has not yet been recognized as a basis for a trial court to dismiss a charging instrument, this does not preclude a trial court from having the authority to dismiss on that ground." *Id.* at 817 (first citing *Frye*, 897 S.W.2d at 330; and then citing *Terrazas*, 962 S.W.2d at 41). But this authority to dismiss does not extend to constitutional violations that could possibly occur in the future. *Id.* Therefore, when there is no constitutional violation, or when the defendant's rights were violated but dismissal of the indictment

22

was not necessary to neutralize the taint of the unconstitutional action, the trial court abuses its discretion in dismissing the charging instrument without the State's consent. *Id.*

## B. We apply the law to the facts.

In its reply, the State asserts several positions in support of its argument that the trial court abused its discretion in granting Johnson's motion to dismiss: (1) "[d]ismissal was not authorized without a due process violation, and even if there were a violation, it was not authorized here [and] *Heath*[10] does not authorize dismissal for [an] article 39.14 violation"; (2) "[t]he sole issue is that the trial court lacked authority to dismiss the indictment, and the State adequately preserved this issue by contesting dismissal at the trial court[, and b]y pointing out that continuance was one of the less drastic remedies available to the trial court, the State was not advocating for a particular remedy"; and (3) "[t]he speedy trial issue was expressly disavowed by the trial court and is not properly before this Court."  We will address these arguments out of order because the speedy-trial argument deals with issues of error preservation in both the trial and appellate courts.

---

[10] *State v. Heath*, 696 S.W.3d 677 (Tex. Crim. App. 2024).  *Heath* was decided after the State filed its opening brief but before Johnson filed his brief.  The State addressed *Heath* in its reply brief.

23

**1. Is the speedy-trial argument properly before us?**

Because the order dismissing the indictment did not state on which ground it was based but merely granted the motion to dismiss generally, the State must challenge every ground raised in the motion. *See State v. Sandoval*, 842 S.W.2d 782, 785 (Tex. App.—Corpus Christi–Edinburg 1992, pet. ref'd) (holding that, when the State appeals orders dismissing charging instruments, it "must challenge every ground raised in the motions to preserve its right to appellate review"); *see also State v. Vasquez*, 695 S.W.3d 924, 928 (Tex. App.—Corpus Christi–Edinburg 2024, pet. ref'd) (holding that "[b]ecause the State is incorrect as to the trial court's limitations and does not address the merits of the dismissals under either legal theory before the trial court, we conclude the trial court did not abuse its discretion in dismissing the indictments"), *State v. Smith*, No. 09-16-00296-CR, 2017 WL 710220, at \*4 (Tex. App.—Beaumont Feb. 22, 2017, pet. ref'd) (per curiam) (mem. op., not designated for publication) (stating that "[w]hile the trial court is not required to specify the reasons for its ruling when dismissing an indictment, it is good practice for trial courts to specifically overrule those grounds not granted; otherwise, the State must challenge every ground raised in the motion"). While it is clear from the motions to dismiss that discovery violations were central to the motions, the parties dispute whether dismissal was grounded in the trial court's consideration of Johnson's speedy-trial right. To decide that question, we first look at whether speedy trial was raised before the trial court.

24

Although it is the State's duty to bring a defendant to trial in a timely manner, it is the defendant's burden to assert the right if violated. *Fuller v. State*, 624 S.W.3d 855, 866 (Tex. App.—Fort Worth 2021, pet. ref'd) (op. on reh'g). Preservation requirements apply to speedy-trial claims. *Henson v. State*, 407 S.W.3d 764, 768 (Tex. Crim. App. 2013). A speedy-trial complaint must be raised in the trial court to allow the trial court to develop the record sufficiently for a *Barker*[11] analysis. *State v. Wyatt*, No. 13-13-00496-CR, 2015 WL 3522967, at *4 (Tex. App.—Corpus Christi–Edinburg June 4, 2015, pet. ref'd) (mem. op., not designated for publication) (citing *Henson*, 407 S.W.3d at 767); *see Jackson v. State*, 657 S.W.2d 874, 876 (Tex. App.—Texarkana 1983, pet. ref'd) ("Appellant's rights under the Speedy Trial Act were not automatic and were not raised until he filed a timely motion to dismiss the indictment for failure of the prosecution to comply with the requirements of the Act."). It is the "accused's burden to develop a record that a speedy trial violation occurred and that it was asserted at the trial court." *Wyatt*, 2015 WL 3522967, at *4 (citing *Grimaldo v. State*, 130 S.W.3d 450, 453 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.)). Allegations in an appellate brief are not enough. *Id.*

We have reviewed both motions to dismiss, and neither mentions any speedy-trial violations. As the State explains in its brief,

> At the [January 31, 2024 hearing], there was discussion by the parties and trial court on the record that Appellee had asserted his right to speedy

---

[11]*Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972).

25

trial on March 29, 2023, but there is no written motion or briefing in the record[,] and the matter was not before the trial court at the January 31, 2024 hearing – no evidence was taken on the matter, no argument made on *Barker* speedy trial factors, and the trial court specifically declined to rule on speedy trial when it made its record findings and ruling.

Indeed, at the conclusion of the hearing on the motion to dismiss, the trial court stated, "Speedy trial was raised March 29th of last year. Again, not ruling on that."

Nevertheless, on appeal, Johnson asserts, "The dismissal of the indictment is further supported by the trial court's consideration of Appellee's previous assertion of his right to a speedy trial." Johnson then does a *Barker* analysis, looking at the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and prejudice to the defendant. *See Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002) (citing *Barker*, 407 U.S. at 530, 92 S. Ct. at 2192) (stating that the factors for the trial court to consider, commonly known as the *Barker* factors, used in analyzing a speedy-trial violation are (1) "whether delay before trial was uncommonly long"; (2) "whether the government or the criminal defendant is more to blame for that delay"; (3) "whether, in due course, the defendant asserted his right to a speedy trial"; and (4) "whether he suffered prejudice as the delay's result").

However, this assertion of an unpreserved speedy-trial right does not require an appellate court to dispose of speedy-trial arguments when the State appeals the granting of an indictment dismissal. *See State v. White*, 306 S.W.3d 753, 760 (Tex. Crim. App. 2010). In *White*, after the trial court granted White's motion to dismiss the indictment against him, "the court of appeals affirmed the trial court's order because

26

the State had failed to explain why that order could not have been proper under the Sixth Amendment speedy trial guarantee when White had (supposedly) 'referenced' the Sixth Amendment in the trial court and had presented evidence to that court of post-indictment prejudice from the deaths of potential witnesses." *Id.* at 758. Disagreeing with the intermediate appellate court, the Texas Court of Criminal Appeals noted that "[c]ontrary to what the court of appeals stated in its opinion, White, in support of his motion to dismiss, never relied on the Sixth Amendment speedy trial guarantee" and that "[b]efore the trial court, White's legal theories were always equity, due process, and due course of law." *Id.* at 759. Therefore, the court of criminal appeals concluded that the State, on appeal, was not obligated to argue why the trial court's order could not also have been proper under the Sixth Amendment speedy-trial guarantee, and the court of appeals erred in holding otherwise. *Id.* at 760.

Similarly here, neither of Johnson's motions to dismiss mentioned or relied upon the Sixth Amendment speedy-trial guarantee. *See State v. Donihoo*, 926 S.W.2d 314, 315 (Tex. App.—Dallas 1994, no pet.) (stating that moving to "dismiss [a] cause for failure of the State to prosecute the Defendant" is not the same as moving to dismiss for denial of a speedy trial). Moreover, Johnson did not develop before the trial court whether a speedy-trial violation had occurred, and there was no *Barker* analysis by the trial court. While the trial court mentioned speedy trial at the hearing on the motion to dismiss, the trial court clearly stated that it was "not ruling on that."

27

Under these circumstances, we conclude that the speedy-trial argument was not properly raised before the trial court and cannot support the dismissal of the indictment.[12] *See id.* Therefore, we will limit our analysis to the discovery issues, which in general were whether Johnson's constitutional rights were violated due to discovery violations and whether dismissal was necessary to neutralize the taint of unconstitutional action. *See* Tex. Code Crim. Proc. Ann. art. 39.14(a); *Mungia*, 119 S.W.3d at 817.

### 2. Were Johnson's constitutional rights violated due to discovery misconduct?

In deciding whether the trial court abused its discretion in dismissing the indictment, we first must decide whether there was a violation of Johnson's constitutional rights due to discovery misconduct. *See Mungia*, 119 S.W.3d at 817. Because the motions to dismiss only alleged "destruction of" and "failure to timely disclose" discovery, our analysis will focus on those grounds.

#### a. We set out the law regarding the State's discovery obligations.

The United States Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process

---

[12]Nevertheless, "a defendant's motivation in asking for dismissal rather than a prompt trial is clearly relevant, and may sometimes attenuate the strength of his claim." *Phillips v. State*, 650 S.W.2d 396, 401 (Tex. Crim. App. 1983); *see Parkerson v. State*, 942 S.W.2d 789, 791 (Tex. App.—Fort Worth 1997, no pet.) ("Appellant's request for a dismissal instead of a speedy trial weakens his claim because it shows a desire to have no trial instead of a speedy trial.").

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97. The purpose of this rule was to avoid an unfair trial of the accused. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011). The Supreme Court later explained that *Brady* essentially created a federal constitutional right to certain minimal discovery. *Id.* (first citing *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375 (1985); and then citing *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392 (1976)).

"*Brady* is violated when three requirements are satisfied: (1) the State suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material." *Ex parte Lalonde*, 570 S.W.3d 716, 724 (Tex. Crim. App. 2019). "Incorporated into the third prong, materiality, is a requirement that [the] defendant must be prejudiced by the state's failure to disclose the favorable evidence." *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). Prosecutors have a duty to learn of *Brady* evidence known to others acting on the state's behalf in a particular case. *Id.*

When the *Brady* material is discovered during trial, the initial inquiry is whether the defendant was prejudiced by the delayed disclosure. *Perez v. State*, 414 S.W.3d 784, 789–90 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see Burton v. State*, 694 S.W.3d 892, 899 (Tex. App.—Houston [14th Dist.] 2024, pet. ref'd) (stating that when the State did not turn over surveillance videos "as soon as practicable," "[e]ven if appellant was not required to show willful conduct on the part of the State,

appellant '. . . still [had to] carry his burden of proving that he was prejudiced.'" (citation omitted)). To show prejudice, the defendant must show a reasonable probability that, had the evidence been disclosed earlier, the result of the proceeding would have been different. *Perez*, 414 S.W.3d at 790.

However, the State's obligation to disclose evidence under Texas Code of Criminal Procedure Article 39.14 is much broader than the constitutional due process obligation recognized in *Brady*. *See Watkins v. State*, 619 S.W.3d 265, 288 (Tex. Crim. App. 2021) ("Not only is there no statutory limitation in Article 39.14(a) to the ultimate issue of guilt or punishment, Article 39.14(h) creates a statutory duty to disclose that is broader than the constitutional due process obligation recognized in *Brady v. Maryland*."). Article 39.14 provides in part:

> (a) Subject to the restrictions provided by Section 264.408, Family Code, and Article 39.15 of this code, as soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statement of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state.
>
> . . . .
>
> (h) Notwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of

the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.

Tex. Code Crim. Proc. Ann. art. 39.14(a), (h).

In *Watkins*, the Texas Court of Criminal Appeals summarized the State's discovery obligations under Article 39.14:

> [T]he Michael Morton Act did not merely amend a portion of Article 39.14(a); it revamped Article 39.14 completely. . . .
>
> On the whole, the statutory changes broaden criminal discovery for defendants, making disclosure the rule and non-disclosure the exception. Significantly, Article 39.14(h) places upon the State a free-standing duty to disclose all "exculpatory, impeaching, and mitigating" evidence to the defense that tends to negate guilt or reduce punishment. Our Legislature did not limit the applicability of Article 39.14(h) to "material" evidence, so this duty to disclose is much broader than the prosecutor's duty to disclose as a matter of due process under *Brady v. Maryland*. This subsection blankets the exact type of exculpatory evidence at issue in the Michael Morton case while creating an independent and continuing duty for prosecutors to disclose evidence that may be favorable to the defense even if that evidence is not "material."
>
> Also, the statute requires the disclosure of evidence that merely "tends" to negate guilt or mitigate punishment. This echoes the definition of evidentiary relevancy. Relevant evidence is any evidence that has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. . . . Under Article 39.14(h), the State has an affirmative duty to disclose any relevant evidence that tends to negate guilt or mitigate punishment regardless of whether the evidence is "material" under *Brady v. Maryland*.
>
> Any evidence that does not fall under Article 39.14(h)—that is, any evidence that does not tend to negate guilt or mitigate punishment—must be disclosed upon request without any showing of "good cause" or the need to secure a discretionary trial court order. Disclosure is mandatory and must occur "as soon as practicable."

619 S.W.3d at 277–78 (footnotes and citations omitted).

The Texas Court of Criminal Appeals recently addressed whether the discovery mandates in Article 39.14(a) that "the state" produce discovery "as soon as practicable after receiving a timely request" include discoverable items which, unbeknownst by the prosecuting attorney, are in the possession of law enforcement agencies. *See Heath*, 696 S.W.3d at 683. In answering that question "yes," the court examined Article 39.14 and the Michael Morton Act and their impact on the State's discovery obligations.[13] *Id.* at 683, 691–92. The court held that "under Article 39.14, 'the state' means the State of Texas, which includes law enforcement agencies, and imposes a duty upon prosecutors as representatives of 'the state' to disclose discoverable evidence 'as soon as practicable,' meaning as soon as the State is reasonably capable of doing so, upon receiving a timely request from the defense." *Id.* at 702.

### b. We apply the law to the facts of this case.

To obtain dismissal of the indictment without the State's consent, it was Johnson's burden to first show that the State's discovery misconduct rose to a constitutional violation. *Mungia*, 119 S.W.3d at 817; *see Williams v. State*, No. AP-77,105, 2024 WL 4701977, at *3 (Tex. Crim. App. Nov. 6, 2024) (stating that the

---

[13]In its reply brief, the State "acknowledges and concedes that, following *Heath*, it had a duty to seek out relevant material held by the Lake Dallas Police Department, and that it had a duty to timely disclose it under [A]rticle 39.14." However, it disputes that such a duty also authorized dismissal of the indictment in this case.

burden is on the defendant to prove prejudice when seeking a pretrial dismissal of an indictment based on a Sixth Amendment violation); *see also Krizan-Wilson*, 354 S.W.3d at 816 (holding that appellee failed to meet her burden of proof where, during the hearing on her motion to dismiss, she failed to present positive proof of the State's "strategic intentional delay"). With regard to "potentially useful" lost or destroyed evidence, it was also Johnson's burden to show "bad faith" on the part of the State in destroying the evidence in order to show a violation of due process. *Ex parte Napper*, 322 S.W.3d 202, 229 (Tex. Crim. App. 2010) (citing *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 333); *see Hanks v. State*, No. 09-23-00132-CR, 2024 WL 4142839, at *11 (Tex. App.—Beaumont Sept. 11, 2024, no pet.) (mem. op., not designated for publication) ("In a criminal case, when spoliation concerns potentially useful evidence, the defendant bears the burden of establishing that the State lost or destroyed the evidence in bad faith.").

Initially, we note that this is not a case where minimal or no discovery was provided to a defendant. Rather, as reflected in Johnson's own timeline that was admitted into evidence at the motion-to-dismiss hearing, discovery was tendered or made available to him within days of the initial May 11, 2021 discovery request. Over the following months, the timeline reflects, in part:[14]

- May 18, 2021: "Discovery was made available through the portal by the State";

---

[14]We have not corrected for grammar, spelling, or punctuation.

- September 2, 2021: "Conference with the State: Sending supplemental discovery and a USB containing Tyson Johnson's Cell Phone download 50.5 GB and another USB with 16 GB of material";

- October 21, 2021: "State responded to discovery request with 2 DVDs from the Medical Examiner's office. Also, needing an additional USB or external drive for the Tyson Johnson phone dump (50.5 GB) and some 16 GB of additional discovery provided by Lake Dallas PD";

- January 25, 2022: "Received 2 additional Lab reports";

- December 8, 2022: "Received Notice from the State: 'Additional discovery has been sent to you through the portal. . . .'";

- February 9, 2023: "Received supplemental Discovery from the State through the portal as well as the CCH of Michael Darrough and Lindsay Crumpton and Email Communication from Lake Dallas PD, DPD Fug Unit and Lake Dallas and Dallas PD Fusion Center";

- August 3, 2023: "Received the Following Discovery from the State: A jail letter written by Shineisha Mann 1/17/23 (2) Lake Cities Fire Records (3) An affidavit of no records from Medical City . . . (4) All Plano PD reports involving Brandon Johnson";

- August 10, 2023: "Received some supplemental discovery on the portal. . . . It consists of photo lineups and some search warrant photos";

- August 14, 2023: "Picked up new discovery from DA's office and reviewed it: it contains about 75 differen[t] videos from 6.22.20 Offense out of Dallas, Collin Co";

- August 21, 2023: "Received supplemental Discovery from the State: Johnson's arrest report and booking sheet from DCSO . . . all of his juvenile documents/paperwork that we received from the juvenile court";

- August 25, 2023: "Telephone conversation with [State's attorney] . . . . She is going to try and send over a flash d[r]ive of Brenda's that has approx. 50G of data on it";

- August 29, 2023: "Received 2 Terabyte HD containing 870GB of data and just under a million files";

- October 25, 2023: "Received Letter from Shineisha Mann through the State";

- December 21, 2023: "Received the image files of the charted fingerprint IDs, along with a chart listing all the IDs for the prints in the Lake Dallas Johnson's Case from the State. Received Detective Stone's Notes from the State"; and

- January 16, 2024: "RECEIVED SUBPOENA DOCUMENTATION FROM LAKE DALLAS PD: Containing 7.56 GB."

Despite this production of discovery, it was not clear at the dismissal hearing what evidence was still missing and what evidentiary value, if any, that evidence had. This evidentiary gap was reflected at the conclusion of the dismissal hearing when the trial court asked, "All right. What's still outstanding? Video?" Johnson's attorney responded,

> Oh, what - - what evidence is still outstanding? Well, right before we sat down, the State provided me with a stack of stuff. I haven't had a chance to go over it in detail, consent to search digital devices and a stack of stuff that has a sticky on the top of it that says, scanned. So presumably, it was thought it was scanned but probably - - and then these are property and evidence records.

The State's attorney went on to explain that when employees from the District Attorney's Office had gone to the Lake Dallas Police Department, they finally decided to just "copy it all again." The State's attorney then added, "If there's any item of

evidence on any of those lists or those sheets, then certainly I have no objection to - - you know, getting that here for them. Again, I believe everything is referenced in all of the reports." Then Johnson's attorney pointed out that some items like "missing photos from the arrest of Brandon Johnson," "supplemental reports," and evidence "related to this other potential Brandon Johnson" were needed. However, Johnson's attorney acknowledged that some items, like "three HomeWAV calls belonging to Brandon Johnson" were within the knowledge of Johnson himself.

In addition to not clearly establishing what discovery was missing, lost, or destroyed, the record also failed to show the "evidentiary relevancy" of that discovery. *See Watkins*, 619 S.W.3d at 277 ("Relevant evidence is any evidence that has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence."). For example, while part of the dismissal hearing focused on the delayed production of what Johnson refers to as "hidden, secret evidence" concerning the "wrong Brandon Johnson," the record reflects its questionable evidentiary relevancy. *See id.*; *see also Morales v. State*, No. 11-17-00055-CR, 2019 WL 1428580, at *3 (Tex. App.—Eastland Mar. 29, 2019, no pet.) (mem. op., not designated for publication) (holding that a missing offense report was "at best, 'potentially useful' evidence"). Hall testified that attorney Goodwin gave her a "wrong name"—a name with a middle name that was different from Appellee's and a first name that was spelled slightly differently from Appellee's. But prior to Goodwin's telephone call, the police had gotten a "hit"

36

identifying Appellee from fingerprints on the car involved in the murder. Stone confirmed Hall's testimony, and according to him, there were other parts of the investigation that corroborated the identity of Appellee, including interviews with neighbors and an eyewitness from that night that described a boyfriend–girlfriend relationship between Shineisha and Johnson. Finally, the transcript of the call between Hall and Goodwin showed that Goodwin had made certain assumptions that led him to identify the wrong Brandon Johnson.

As pointed out by the State, it is also difficult to assess a due-process violation based on discovery misconduct when there has been no trial. To establish the prejudice required by *Brady*'s third prong, the defendant must show that in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure. *Taylor v. State*, 699 S.W.3d 33, 42 (Tex. App.—Amarillo 2024, pet. filed) (citing *Boyd v. State*, No. 03-17-00353-CR, 2018 WL 1278718, at *3 (Tex. App.—Austin Mar. 13, 2018, no pet.) (mem. op., not designated for publication)); *see Hanks*, 2024 WL 4142839, at *16 ("A *Brady* claim requires proof that the evidence was both material and favorable to the defendant such that there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different."). Here, because dismissal was granted prior to trial, we cannot assess the prejudice, if any, caused by the discovery violations.

Finally, the record is also unclear exactly what evidence might have been lost, destroyed, or spoliated. As explained by one of our sister courts, there is a distinction between these categories of evidence:

> In the context of a criminal proceeding, there is a distinction between how we view evidence in the government's possession and that which the government no longer possesses—including evidence which the government no longer possesses because it has been lost or destroyed. [*State v.*] *Fellows*, 471 S.W.3d [555,] 562 [(Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd)]; *see . . . Youngblood*, 488 U.S. [at] 55, 109 S. Ct. [at 336] (1988); *Brady*, 373 U.S. at 87, 83 S. Ct. 1194. *Brady* addresses the former while the latter is governed by *Youngblood. Fellows*, 471 S.W.3d at 562; *see Garcia v. State*, 592 S.W.3d 590, 600–01 (Tex. App.—Eastland 2019, no pet.) ("Although courts occasionally blur the distinction between *Youngblood* and *Brady, Youngblood* is properly applied to cases in which the government no longer possesses the disputed evidence, whereas *Brady* is properly applied to cases in which exculpatory evidence remains in the government's possession." (quoting *Moody v. State*, 551 S.W.3d 167, 170–71 (Tex. App.—Fort Worth 2017, no pet.))); *see also McVay v. State*, No. 01-19-00480-CR, 2020 WL 7391556, at *3 (Tex. App.—Houston [1st Dist.] Dec. 17, 2020, pet. ref'd) (mem. op., not designated for publication) ("The Court of Criminal Appeals has held that *Youngblood*, and not *Brady*, is properly applied to cases in which the government no longer possesses the disputed evidence"). To satisfy the standard enunciated in *Youngblood*, a defendant has the burden of demonstrating that the State or its actors lost or destroyed the evidence and did so in bad faith.[] *See Youngblood*, 488 U.S. at 58, 109 S. Ct. 333 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); *Guzman*, 539 S.W.3d at 401; *see also State v. Tooley*, No. 07-21-00103-CR, 2021 WL 4282632, at *1 (Tex. App.—Amarillo Sept. 21, 2021, pet. ref'd) (mem. op., not designated for publication).

*State v. Villarreal*, 692 S.W.3d 844, 849–50 (Tex. App.—Corpus Christi–Edinburg 2024, pet. filed) (mem. op.); *see Green v. State*, 607 S.W.3d 147, 156 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("When conduct can, at worst, be described as

38

negligent, the failure to preserve evidence does not rise to the level of a due process violation absent extraordinary circumstances not present here."); *see also Hanks*, 2024 WL 4142839, at *11 ("The duty to preserve evidence is limited to evidence that possesses an exculpatory value that was apparent before the evidence was destroyed."); *Gutierrez v. State*, No. 03-23-00450-CR, 2024 WL 3841609, at *8 (Tex. App.—Austin Aug. 16, 2024, no pet.) (mem. op., not designated for publication) (holding that even if the State failed to disclose the identity of and allegedly exculpatory statements of a witness, the failure did not affect appellant's "substantial rights").

Ultimately, the discovery conduct here was described by the trial court as "reckless" and without any "purposeful, evil intent." *See Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337 ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). It did not amount to bad faith, which "requires 'more than simply being aware that one's actions or inaction could result in the loss of something that is recognized to be evidence.'" *Green*, 607 S.W.3d at 156 (quoting *Napper*, 322 S.W.3d at 238). Bad faith requires a showing of "some sort of improper motive, such as personal animus against the defendant or a desire to prevent the defendant from obtaining evidence that might be useful." *Id.*; *see Nichols v. State*, No. 02-17-00147-CR, 2018 WL 1865880, at *6 (Tex. App.—Fort Worth Apr. 19, 2018, pet. ref'd) (mem. op., not designated for publication) (concluding that the record does not

support a conclusion that the police officer acted in bad faith or knew that the text-message exchange had exculpatory value when she deleted the exchange).

Therefore, given the unclear record in this case, we will merely assume without deciding that the discovery misconduct rose to the level of a due-process violation. Based on that assumption, we must then decide whether dismissal was the appropriate relief to neutralize the taint of unconstitutional action. *See Frye*, 897 S.W.2d at 330. If Appellee's rights were violated but dismissal of the indictment was not necessary to neutralize the taint of the unconstitutional action, then the trial court abused its discretion by dismissing the indictment. *See Terrazas*, 962 S.W.2d at 42.

### 3. Was dismissal necessary to neutralize the taint of unconstitutional action?

The State argues that "even assuming the trial court had authority to dismiss, and additionally assuming that the prosecution's article 39.14 duties were triggered with respect to information not in the possession of the D.A.'s office, the drastic remedy of dismissal was excessive where a continuance could have been granted to allow Appellee time to review the recently disclosed evidence."[15] We agree.

---

[15]Johnson urges on appeal that "failing to grant a continuance was not preserved for appellate review." Johnson notes that neither he nor the State requested a continuance; therefore, the State's argument that the appropriate remedy should have been a continuance may not be raised for the first time on appeal. *See* Tex. R. App. P. 33.1. The State responds that error-preservation requirements did not require it to move for continuance because it "was not requesting any specific relief at that hearing—it was [Johnson's] motion." *See generally Bekendam v. State*, 441 S.W.3d 295, 299 (Tex. Crim. App. 2014). We agree. Here, the State is not appealing the denial of a motion for continuance. Rather, it is appealing the granting of a motion to

We first note that Article 39.14 contains "no built-in sanctions or remedial measures" for dealing with discovery violations. *Love v. State*, 600 S.W.3d 460, 477 (Tex. App.—Fort Worth 2020, pet. ref'd). "Failure to comply with court orders on discovery may warrant suppression of the evidence in question, but discovery abuse is not recognized in the Texas Code of Criminal Procedure as a basis for dismissing the case with prejudice." *State v. Banda*, No. 03-10-00729-CR, 2011 WL 3890389, at *3 (Tex. App.—Austin Aug. 31, 2011, pet. ref'd) (mem. op., not designated for publication); *see State v. Bragg*, 920 S.W.2d 407, 408 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) (reversing trial court's order dismissing indictment with prejudice for, among other grounds, failure to "fully comply" with discovery order).

While some constitutional violations, by their nature—for example, the right to a speedy trial and certain Sixth Amendment violations—confer authority on the trial court to dismiss an indictment without the prosecutor's consent, most constitutional violations do not require such a drastic remedy. *State v. McNutt*, 405 S.W.3d 156, 160 (Tex. App.—Houston [1st Dist.] 2013, pet ref'd); *see Terrazas*, 962 S.W.2d. at 44 (Keller, P.J., dissenting) (stating that the right against double jeopardy and the right to a speedy trial are "[t]wo classic examples" of constitutional violations which confer

---

dismiss the indictment, which was a motion on which Johnson bore the burden of proof. *Cf. Allred v. State*, No. 13-22-00524-CR, 2024 WL 3306742, at *6 (Tex. App.—Corpus Christi–Edinburg July 5, 2024, no pet.) (mem. op., not designated for publication) (stating that Allred waived his Article 39.14(a) complaint when he affirmatively informed the trial court that he was not requesting a continuance).

authority on the trial court to dismiss when dismissal is necessary to protect the constitutional right).  "[R]eversal of the conviction and, where the Double Jeopardy Clause does not dictate otherwise, the provision of a new trial free of prejudicial error normally are adequate means of vindicating the constitutional rights of the accused." *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 268, 102 S. Ct. 3081, 3084 (1982). Remedies should be tailored to remove the harm caused by the constitutional violation.  *Morrison*, 449 U.S. at 366–67, 366 n.2, 101 S. Ct. at 668–69, 668 n.2.

In *Morrison*, the United States Supreme Court discussed circumstances under which dismissal of a charging instrument might be an appropriate remedy for violations of a defendant's Sixth Amendment right to counsel.  *See id.* at 361, 101 S. Ct. at 665.  The Court noted that when confronted with a Sixth Amendment violation, a trial court must "tailor[] relief appropriate in the circumstances to assure the defendant effective assistance of counsel."  *Id.* at 365, 101 S. Ct. at 668; *Williams*, 2024 WL 4701977, at *3 ("When confronted with a Sixth Amendment violation, a trial court must, 'identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant effective assistance of counsel and a fair trial.'" (quoting *Morrison*, 449 U.S. at 361, 365, 101 S. Ct. at 665)).  According to the Court, suppressing evidence and limiting cross-examination are the preferred methods for neutralizing the effects of right-to-counsel violations.  *Morrison*, 449 U.S. at 365, 101 S. Ct. at 668.  "More particularly, absent demonstrable prejudice, or substantial

42

threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.*, 101 S. Ct. at 668.

Recently, in *Heath*, the court of criminal appeals concluded that the State had violated Article 39.14(a), but it again acknowledged that "Article 39.14 has never included a provision concerning the remedy for a discovery violation." 696 S.W.3d at 703. In examining whether a trial court has authority to exclude evidence as a result of a discovery violation, the court looked to civil cases[16] for their approach to

---

[16]The *Heath* court noted that "the original version of Article 39.14 was patterned after its civil counterpart, Rule 167 of the Rules of Civil Procedure." 696 S.W.3d at 691. Several articles in the Texas Code of Criminal Procedure also expressly apply civil rules. *See, e.g.*, Tex. Code Crim. Proc. Ann. art. 39.04 ("The rules prescribed in civil cases for issuance of commissions, subpoenaing witnesses, taking the depositions of witnesses and all other formalities governing depositions shall, as to the manner and form of taking and returning the same and other formalities to the taking of the same, govern in criminal actions, when not in conflict with this Code."), .05 (objections), .06 (written interrogatories), .10 (return of depositions). Also, criminal cases have previously looked to civil rules for guidance concerning certain criminal matters. *See Ex parte Thuesen*, 546 S.W.3d 145, 151 (Tex. Crim. App. 2017) (noting that the Texas Court of Criminal Appeals "has looked to the Texas Rules of Civil Procedure for guidance concerning the recusal of trial judges in criminal cases and habeas corpus proceedings"); *McQuarrie v. Stone*, 380 S.W.3d 145, 167 n.31 (Tex. Crim. App. 2012) (Cochran, J., dissenting) (noting that courts in criminal cases should "look to civil cases for guidance on what constitutes an 'outside influence'" (quoting *In re S.P.*, 9 S.W.3d 304, 308–09 (Tex. App.—San Antonio 1999, no pet.))); *see also De Leon v. Aguilar*, 127 S.W.3d 1, 5 (Tex. Crim. App. 2004) ("The procedures for recusal of judges set out in Rule 18a of the Texas Rules of Civil Procedure apply in criminal cases."); *Williams v. State*, 767 S.W.2d 868, 871 (Tex. App.—Dallas 1989, pet. ref'd) ("In civil cases, an instrument is generally deemed filed when it is left with the clerk regardless of whether a file mark is placed on the instrument. [Citation omitted.] We see no reason why the same rule should not apply in criminal cases, and we hold that it does.").

discovery, noting that they "possess much broader inherent authority to fashion a remedy for a discovery violation." *Id.* at 706. The court stated,

> Rule 215.2 provides a non-exhaustive list of possible sanctions by a court for the failure to comply with proper discovery requests or orders that permits a trial court to "make such orders in regard to the failure as are just," and includes, "among others" disallowing further discovery, charging discovery expenses, prohibiting matters in evidence, prohibiting the disobedient party from making designated claims or defenses, and even taking as established facts regarding the matter for which discovery was ordered.

*Id.* Although ultimately holding that the trial court acted within its discretion in excluding a 911 call based on violation of the discovery statute, the court agreed that "a continuance would [have been] a much more restrained solution." *Id.* at 708.

Such a "restrained solution" was not found here. Rather, dismissal of the indictment amounted to a death-penalty sanction. *Cf. Altesse Healthcare Sols., Inc. v. Wilson*, 540 S.W.3d 570, 572 (Tex. 2018) (defining a death-penalty sanction as one in which "the offending party essentially loses the case because of the sanction" and that is "generally reserved for the most egregious cases in which the offending party's conduct justifies a presumption that its claims lack merit"); *see also TransAm. Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917–18 (Tex. 1991) (orig. proceeding) (stating that death-penalty sanctions "are the most devastating a trial court can assess against a party" and that when a trial court strikes pleadings and dismisses an action for abuse of the discovery process, "the court adjudicates the party's claims without regard to their merits but based instead upon the parties' conduct of discovery").

44

In civil cases, death-penalty sanctions should be imposed only in exceptional cases when they are clearly justified and it is apparent that no lesser sanctions would promote compliance with the rules. *See Cire v. Cummings*, 134 S.W.3d 835, 840–41 (Tex. 2004) (holding death-penalty sanctions were justified when plaintiff deliberately destroyed audiotapes she refused to produce because they were unfavorable to her claims); *see also Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003) (requiring a trial court to consider less stringent measures before settling on severe sanctions but reiterating that death-penalty sanctions may only be imposed in the first instance when the facts of the case are exceptional and such a sanction is "clearly justified"). Discovery sanctions severe enough to inhibit presentation of the merits of a case should be reserved for a party's flagrant bad faith or an attorney's callous disregard for the discovery rules. *See Spohn Hosp.*, 104 S.W.3d at 883.

Before death-penalty sanctions are imposed in civil cases, a court must also ensure that the sanction does not violate the party's due-process rights. *See Imagine Auto. Grp. v. Boardwalk Motor Cars, Ltd.*, 430 S.W.3d 620, 633 (Tex. App.—Dallas 2014, pet. denied). A death-penalty sanction does not offend due process when (1) the trial court first considers less severe sanctions and (2) the offensive conduct justifies a presumption that the offending party's claims or defenses lack merit. *Id.* (first citing *Response Time, Inc. v. Sterling Com. (N. Am.), Inc.*, 95 S.W.3d 656, 659 (Tex. App.—Dallas 2002, no pet.); and then citing *TransAm.*, 811 S.W.2d at 917–18). Here, the record shows that the trial court did not consider less severe sanctions, and the

45

discovery misconduct did not justify a presumption that the State's claims lacked merit.

While the trial court stated that it had previously "sua sponte" continued the case due to discovery issues, the record did not reflect that the trial court considered a second continuance as a possible remedy. *See Burton*, 694 S.W.3d at 897 ("A continuance can be an appropriate remedy for failure to timely disclose evidence that is within the trial court's discretion."). Such a remedy would have been less drastic, would not have inhibited the presentation of the case, and would protect both the State and Johnson. *Cf. Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) (describing a continuance as "a much less drastic remedy" to mistrial and concluding that because the appellant failed to seek one to obtain purportedly needed evidence, the trial court did not abuse its discretion when denying the mistrial); *see State v. Heath*, No. PD-0156-22, 2024 WL 4281049, at *2 (Tex. Crim. App. Sept. 25, 2024) (Keller, P.J., dissenting on denial of rehearing) (stating that "[a]s the amount of evidence in criminal cases expands to terabyte level, . . . it is inevitable that items with evidentiary value will sometimes be overlooked" and that "an inadvertent mistake by an overworked prosecutor could leave crime victims without justice when the remedy of a continuance would protect both the defendant and the victim").

Other less drastic remedies could also have possibly addressed the concerns raised. *See Terrazas*, 962 S.W.2d at 45 (Keller, P.J., dissenting). Those remedies include suppressing evidence and limiting cross-examination during trial. *See Frye*,

46

897 S.W.2d at 330; *see also Gaitan v. State*, 905 S.W.2d 703, 706 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) ("The preferable methods for neutralizing the effect of the State's violation of appellant's right to counsel are suppressing evidence and limiting cross-examination during trial."). Indeed, Johnson's prayer in his first motion asked alternatively for dismissal of the charge against him, submission of a limiting instruction on spoliation, or suppression of "the evidence related to the autopsy or at least the cause of death testimony by [the] Medical Examiner." Johnson's second motion also alternatively sought suppression of certain evidence. Despite these alternative requests, the record does not reflect that the trial court considered them.

In summary, even assuming without deciding that the discovery violations rose to the level of a due-process violation, we hold that the trial court failed to consider lesser sanctions—such as granting a continuance, suppressing evidence, giving a spoliation instruction, or limiting cross-examination—before dismissing the murder indictment. Therefore, we hold that the trial court abused its discretion in dismissing, without the State's consent, Johnson's murder indictment—"'a drastic measure only to be used in the most extraordinary circumstances'"—because the record does not show that lesser sanctions for the discovery violations were considered to neutralize the taint of any unconstitutional action. *See Williams*, 2024 WL 4701977, at *3 (quoting *Frye*, 897 S.W.2d at 330); *Mungia*, 119 S.W.3d at 817. We sustain the State's sole issue.

## IV. CONCLUSION

Having sustained the State's sole issue, we reverse the trial court's order dismissing the murder indictment and remand for further proceedings.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  December 19, 2024